UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW BICKEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 25 C 3454 |
| | ) |
| NORDIC ENERGY SERVICES, LLC, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andrew Bickel contracted to purchase natural gas from Defendant Nordic Energy Services, LLC ("Nordic") for Bickel's home in Demotte, Indiana. He alleges that after a period of fixed pricing, Nordic began charging variable rates that are consistently higher than promised in the contract. In this lawsuit he characterizes Nordic's conduct as an unlawful "bait-and-switch" scheme, and seeks to represent a class of Nordic customers. On behalf of a proposed nationwide class, Bickel brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of various states' consumer protection laws. On behalf of a proposed sub-class of Indiana-based Nordic customers, Bickel alleges violations of the Indiana Deceptive Consumer Sales Act ("IDCSA").

Nordic has moved to dismiss the complaint under FED. R. CIV. P. 12(b)(6) [17] and FED. R. CIV. P. 12(b)(1) [18]. For the reasons explained here, Nordic's motion to dismiss for failure to state a claim [17] is granted in part and denied in part. Bickel's claims on behalf of customers outside Indiana are dismissed without prejudice, and the court will grant Bickel leave to amend his complaint. As Nordic's Rule 12(b)(1) motion to dismiss [18] challenges the court's jurisdiction on those class claims only, it is stricken as moot.

**BACKGROUND**

I.   **Factual Background**

The following facts are alleged in the Complaint [1], which the court accepts as true at this stage. *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 926 (7th Cir. 2025).

   A.   **Facts Specific to Bickel**

In the late 1990's, many states—including, as relevant here, Indiana—deregulated their markets for natural gas supply to give consumers more alternatives for energy providers. (Compl. ¶¶ 19–20.)  Several alternative retail energy suppliers ("ARES") emerged in the wake of deregulation.  An ARES buys electricity or natural gas from suppliers on the same market available to utilities, and then sells it to customers, essentially acting as an energy broker, but with greater flexibility than utilities in choosing how and where to source the energy. (*Id.* ¶ 20.)  For example, unlike a utility, an ARES may own energy production facilities or purchase energy in advance through futures contracts. (*Id.* ¶ 26.)  It is this flexibility that allows ARES to offer competitive rates, which accords with the purpose of deregulation: to give customers more options. (*Id.* ¶¶ 27, 29.)

Defendant Nordic, an Illinois LLC, is one such ARES operating across the United States. (*Id.* ¶ 2; Joint Statement Confirming Subject Matter Jurisdiction [38] at 1–2.)[1]  Nordic promotes its energy supply service by offering customers natural gas or electricity at a fixed rate for a few months; after that, the customers pay a variable rate. (Compl. ¶ 3.)  This variable rate has two components, the first of which Bickel refers to as the "Variable Commodity Component" ("VCC"),

---

[1] On January 5, 2026, the court directed parties to file statements confirming the court's subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). (Min. Order [37].)  In a joint statement [38], parties provided facts sufficient to demonstrate minimum diversity of parties under the CAFA, as Bickel is a citizen of Indiana and Nordic is an LLC with all of its members domiciled in Illinois.  Moreover, Bickel sufficiently alleged an aggregate amount in controversy in excess of $5 million. (Joint Statement Confirming Subject Matter Jurisdiction [38] at 1–2.)  The court is thus satisfied that it has subject matter jurisdiction over Bickel's claims.

or the cost to acquire the energy, and the second of which Bickel calls the "Transportation Storage Component" ("TSC"), or the cost to transport and store the energy. (*Id.* ¶ 3.) In 2022, Bickel entered into an agreement[2] ("Nordic Terms & Conditions") with Nordic for the purchase of natural gas for his home in Indiana on the following price terms:

> Nordic Energy agrees to act as Customer's exclusive natural gas supplier as set forth in this Agreement and is offering Customer a fixed rate of $.0990 per therm for your metered usage for the first three (3) months of the term, for your natural gas, plus the other charges outlined below associated with gas delivery and storage. ***After that, the price will be a variable price equal to Nordic's cost to acquire your supply plus 25 cents per therm.[3]  Please note that the fixed price and the variable price apply only to the price of natural gas, not to the other charges associated with gas delivery including interstate pipeline demand and capacity charges as well as interstate transportation and storage and related storage capacity charges and or the LDC established pipeline and storage mitigation services.*** . . . Interstate transportation and capacity charges shall be billed to Customer at the rate listed for Nordic Energy on the NIPSCO Choice website.

(Compl. ¶¶ 4, 34 (emphasis added); Nordic Terms & Conditions [18-2] at 6.) Thus, the VCC is set at "Nordic's cost to acquire" Bickel's supply "plus 25 cents per therm," and the TSC is defined as "the other charges associated with gas delivery," including transportation and storage costs, as well as additional charges referred to vaguely as "storage capacity charges" and "storage mitigation services." (Compl. ¶ 4.) These two charges determine the total price Nordic customers pay for natural gas.

Bickel alleges that during the two years in which he was under contract with Nordic, Nordic charged more than the promised rate with respect to the VCC and TSC components. First, as to

---

[2] While Bickel did not attach his contract to his complaint, Nordic attached it to its motion to dismiss. Nordic also attached other contracts with customers outside Indiana who would be members of the proposed plaintiff class. Because these contracts are referred to in the complaint and central to Bickel's claims, the court can consider them at the motion to dismiss stage. *In re Harley-Davidson*, 151 F.4th at 926 ("Because the limited warranty is referred to in the complaint and central to the plaintiffs' claims, we can consider it under the incorporation-by-reference doctrine.").

[3] A "therm" is a unit of measurement for heat. *Therm*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/therm (last accessed February 13, 2026).

the VCC, while Nordic's actual costs are unknown, data on the market price of natural gas is publicly available. (*Id.* ¶¶ 38–39.) These prices are known as the "city-gate price," or the price of natural gas when it is transferred from inter- or intra-state pipelines to local utilities, and it reflects the wholesale price in addition to the cost of transportation to the city gate. (*Id.* ¶ 40.) An ARES can purchase natural gas at the city-gate price or find lower cost alternatives. (*Id.*) Whether an ARES might in some instances pay a higher price when it purchases from an alternative source is not stated, but Bickel maintains that the city-gate price is a conservative figure for estimating Nordic's cost of acquiring his natural gas supply. (*Id.* ¶ 41; *see* Opp'n [21] at 9–10.)

When Bickel's VCC charges are compared with the corresponding city-gate price of natural gas, plus twenty-five cents per therm—the price anticipated by the contract—it appears that Nordic consistently overcharged Bickel by anywhere from 6% to 100% for all but one month of his nearly-two-year contract term. (*Id.* ¶ 39.) Further, when VCC charges are compared to the rates charged by the local legacy utility provider, NIPSCO (for which Nordic claims to be a less-expensive alternative), Nordic overcharged Bickel anywhere from 3% to 70% each month. (*Id.* ¶¶ 43–45.)

Bickel alleges that he was overcharged on the TSC component as well. Again, the TSC component is described as "the other charges associated with gas delivery," including certain transportation and storage costs, referred to as "storage capacity charges" and "storage mitigation services." (*Id.* ¶ 4.) Bickel contends that a reasonable consumer would interpret this to mean that Nordic passes through its delivery charges without a markup. (*Id.* ¶¶ 49–50.) In fact, Bickel alleges, Nordic includes a substantial markup that is not disclosed to the consumer. (*Id.* ¶ 51.) Again, as compared with the transportation and storage prices charged by NIPSCO (which Bickel alleges is an appropriate comparator for Nordic), Nordic overcharged Bickel anywhere from 52% to 1,400%. (*Id.* ¶¶ 52–53.) Nordic also charged significantly higher transportation costs than other ARES. (*Id.* ¶ 54.) Taken together, Bickel claims that these overcharges on both

components of his monthly Nordic gas bill constitute a breach of contract and a breach of the implied covenant of good faith and fair dealing.

### B. Class Action Claims

Bickel alleges that Nordic violated the Indiana Deceptive Consumer Sales Act ("IDCSA"), IND. CODE ANN. § 24-5-0.5-3, by "intentionally deceiv[ing]" customers—specifically, he alleges that Nordic intentionally overcharged customers by affirmatively misrepresenting that it would "charge a rate based on the formulas in its contracts knowing full well that it would charge a much higher rate." (Compl. ¶ 95.) He brings this claim on behalf of himself and a proposed Indiana subclass.

Bickel also alleges that Nordic uses this same contract language across the country in promoting its natural gas and electricity supply. Accordingly, he brings claims "on behalf of a class of all residential and commercial customers of Nordic in the United States whose contracts have either a Variable Commodity Component or a Transportation and Storage Component." (*Id.* ¶ 58.) These are claims for violations of "materially identical" consumer protection statutes in Delaware, the District of Columbia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Virginia. (*Id.* ¶¶ 111–112.) Bickel does not, however, lay out any facts to demonstrate that Nordic overcharged customers in states outside of Indiana.

## DISCUSSION

### I. Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is considered plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). "[D]etailed factual allegations" are not required, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Similarly, a motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. "[S]ubject matter jurisdiction is a fundamental limitation on the power of a federal court to act." *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 980 (7th Cir. 2000). If a federal court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3). As the party invoking federal jurisdiction, Bickel bears the burden of demonstrating jurisdiction by a preponderance of the evidence. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

## II. Analysis

Nordic moves to dismiss Bickel's complaint under Rule 12(b)(6) for failure to state a claim and under Rule 12(b)(1) for lack of standing to pursue class claims. In the alternative, Nordic asks the court to convert this motion into one for summary judgment and consider a series of declarations from Nordic employees, which effectively state that (1) Nordic properly charged Bickel under the contract, and (2) no customers outside of Indiana have the same contract as Bickel. (*See* Roback 1st Decl. [17-1]; Roback 2d Decl. [18-1]; Shapiro Decl. [17-3].) A motion for summary judgment is premature at this stage, and the court therefore declines to consider the declarations.

The court first evaluates Nordic's motion to dismiss under Rule 12(b)(6). The court finds that Bickel has effectively stated a claim for breach of contract and violations of the IDCSA, but dismisses Bickel's claim for an independent breach of the implied covenant of good faith and fair dealing. As for Bickel's class claims, the court dismisses these claims with leave to amend, as Bickel has not made allegations sufficient to support an inference that Nordic overcharged customers outside of Indiana for their utilities. Nordic's motion to dismiss under 12(b)(1) challenges the court's jurisdiction only on non-Indiana class claims, and is therefore stricken as moot.

6

### A. 12(b)(6) Motion to Dismiss

Nordic argues that Bickel's individual claim must be dismissed because (1) his pleadings do not sufficiently allege a breach of the VCC clause; (2) he fails to plead a breach of the TSC clause; (3) Indiana law[4] does not provide for a claim for breach of the implied covenant of good faith and fair dealing; (4) the Indiana Deceptive Practices Act claim is time-barred and improperly pleaded; and (5) all state law consumer protection claims fail because they are duplicative of the contract claims.[5] (Mot. [17] at 5–16.) The court examines each in turn.

#### 1. Breach of VCC Clause

To state a claim for breach of contract under Indiana law, a plaintiff must allege "the existence of a contract, the defendant's breach, and damages to the plaintiff as a result." *Correct Roofing, Inc. v. Vasquez*, 246 N.E.3d 328, 338 (Ind. Ct. App. 2024) (citation omitted). In interpreting a contract under Indiana law, courts seek to "ascertain the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties." *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017). The court will "examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Cocquyt v. SpartanNash Co.*, No. 21-3254, 2022 WL 3273804, at *3 (7th Cir. Aug. 11, 2022) (quoting *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839

---

[4] Because this claim arises out of the court's diversity jurisdiction, the court looks to the "conflict-of-laws rules of the forum state," Illinois, to determine which state's "applicable substantive law" will apply in this case. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). "Illinois applies contractual choice of law provisions unless they are contrary to Illinois public policy." *Sutter Ins. Co. v. Applied Sys., Inc.*, No. 02 C 5849, 2004 WL 161508, at *7 (N.D. Ill. Jan. 26, 2004). The contract at issue here is "governed by, construed, and enforced in accordance with the laws of the State of Indiana without regard to conflict of law principles." (Mot. [17] at 8 n.9.) Bickel does not oppose Defendant's characterization of this provision of the contract, so the court will apply Indiana law.

[5] Bickel agrees that his unjust enrichment claim should be dismissed, because under Indiana law, unjust enrichment claims are unavailable when the parties have entered into a valid express contract. *See DiMizio v. Romo*, 756 N.E.2d 1018, 1025 (Ind. Ct. App. 2001) ("Unjust enrichment operates when there is no governing contract.").

(Ind. Ct. App. 2017)). If "reasonably intelligent persons would honestly differ" as to a contract's meaning, the contract is ambiguous and its meaning becomes a question of fact for the fact finder. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007); *Celadon Trucking Servs.*, 70 N.E.3d at 839. When evaluating a Rule 12(b)(6) motion to dismiss, ambiguities in the contract are resolved in favor of the plaintiff if one reasonable way of interpreting ambiguous language would support a claim. *LaSalle Commercial Mortg. Sec., Inc. v. Bank of Am., N.A.*, No. 13 C 5605, 2014 WL 4124249, at *4 (N.D. Ill. Aug. 21, 2014) (applying New York law and denying motion to dismiss breach of contract claim because contract language was "reasonably susceptible" to two different meanings and was ambiguous).

The existence of an agreement here is undisputed, but Nordic argues that Bickel has failed to identify a breach. The court draws all reasonable inferences in favor of Bickel, but "to the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls." *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005).

Bickel alleges that Nordic breached the provision in the contract governing how Nordic would charge customers for the VCC by consistently overcharging its customers. To flesh out this allegation, Bickel outlines comparisons between Nordic's VCC and NIPSCO's gas supply price, as well as Nordic's VCC and the "city gate price," plus an additional "adder" of 25 cents per therm.[6] Nordic argues that these comparisons are improper as a matter of law. In support, Nordic cites to *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610 (7th Cir. 2019), where the Seventh Circuit affirmed dismissal of a breach of contract claim that rested on comparison of a regulated utility's prices to ARES prices, and *Hamlen v. Gateway Energy Servs. Corp.*, No. 16 CV 3526, 2017 WL 892399 (S.D.N.Y. Mar. 6, 2017), where the court found conclusory allegations comparing the wholesale rate of natural gas and competitor prices to ARES prices were insufficient to state claims akin to those Bickel has alleged here. Bickel argues that those cases

---

[6] The parties refer to this fixed 25-cent markup as an "adder" throughout their pleadings, and the court adopts the terminology.

are distinguishable. He cites, instead, *IUE-CWA Loc. 901 v. Spark Energy, LLC*, 440 F. Supp. 3d 969 (N.D. Ind. 2020), where the district court declined to dismiss similar claims against an alternative natural gas supplier.

In *Sevugan*, the complaint alleged that the defendant—an ARES like Nordic—breached its customer contract by failing to set variable rates that were based on market prices and by increasing the fixed adder to an unreasonable level. 931 F.3d at 612–14. The contract at issue stated that the defendant ARES would charge consumers a variable price per unit of energy "based upon generally prevailing market prices for electricity." *Id.* at 613. The plaintiff alleged, as Bickel does here, that the defendant breached the contract by overcharging customers. For factual support, the plaintiff compared the defendant ARES's prices with (1) those charged by the local Illinois utility, Commonwealth Edison ("ComEd"), and (2) the wholesale price for electricity. *Id.* at 614, 616. The Seventh Circuit concluded that the district court properly rejected the comparison to the wholesale price because regular consumers "could not go out and purchase electricity at the [wholesale] rate." *Id.* at 615. Nor was ComEd's pricing an appropriate basis for comparison to the prices charged by an ARES because ComEd's prices were regulated, not based on the general market for electricity. *Id.* at 616. Because the contract at issue stated that prices would be set "competitively" and gave the defendant discretion to set the adder, the only appropriate point of reference could be prices set by competing ARESs—but plaintiff's allegations as to prices charged by other ARES were too conclusory to support a claim. *Id.* Importantly, the Seventh Circuit distinguished this contract from ones that included more specific language, like, for example, a "guarantee" to set prices "in response to changing market conditions." *Id.* at 618, n.5 (citing *Oladapo v. Smart One Energy, LLC*, No. 14 CV 7117-LTS, 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016)).

In *Hamlen,* a district court in the Southern District of New York similarly found that plaintiff's comparison of the defendant ARES's cost to wholesale rates was not, by itself, sufficient to state a claim under any of plaintiff's proposed theories. 2017 WL 892399, at *4. The court dismissed

plaintiff's breach of contract claim because "[t]he contract expressly granted defendant discretion to set rates based on many other factors" outside of just the wholesale price or competitor's rates. *Id.* In fact, the contract at issue there outlined several paragraphs of factors that could impact defendant's pricing discretion, and stated explicitly that "our supply costs may not directly follow spot market prices." *Id.* at *1.

The contract here is distinguishable from both the *Hamlen* and *Sevugan* contracts in that Nordic's contract contains specific—not discretionary—language. It promises that the VCC will be set according the "cost of acquiring" energy plus an adder of twenty-five cents. (Compl. [1] ¶ 4.) Unlike the contract in *Sevugan*, Nordic's adder is fixed, not discretionary. *Cf.* 931 F.3d at 617. And while the contract in *Hamlen* outlined several factors that afforded the ARES defendant discretion in setting their prices, Nordic's contract contains no such factors. *Cf.* 2017 WL 892399 at *4. True, Nordic's contract is ambiguous regarding what Nordic's "cost of acquisition" entails, and reasonable minds could differ as to what goes into the cost of acquisition. But in *IUE-CWA Loc. 901 v. Spark Energy, LLC*, 440 F. Supp. 3d 969, 980 (N.D. Ind. 2020), a case Plaintiff here relies on, another federal court found that it was precisely such ambiguity that supported a plausible claim. In that case, defendant ARES's prices were contractually tied to "market prices," and did "not confer . . . broad discretion" on the defendant. *Spark Energy*, 440 F. Supp. 3d at 974, 979. The court considered *Sevugan* and distinguished it, observing that the phrase "based on market prices" was ambiguous, but "[o]ne interpretation is that it encompasses something close to procurement costs, plus a commercially reasonable profit margin." *Id.* at 979. The same reasoning is applicable here. Absent discretionary language outlining possible additional costs, Bickel's interpretation—that Nordic would charge only the price it paid to acquire natural gas, plus a fixed adder—is a reasonable one.

Despite those differences in the contractual language, *Sevugan*'s analysis of proper comparators has some relevance here, in that Bickel has compared Nordic's prices to the gas supply price charged by NIPSCO, the regulated utility. This is, as in *Sevugan*, a comparison of

apples to oranges, as regulated utilities do not "participate in the general market for electricity." 931 F.3d at 616. But Bickel also compares Nordic's VCC to the wholesale cost for gas (or the city-gate price). This is a meaningful comparison because, Bickel alleges, the wholesale cost is a price at which Nordic can purchase gas. (Compl. [1] ¶ 41; *see* Opp'n. [21] at 9–10.) Bickel does not argue that the total price paid by the customer for natural gas must be similar to the city-gate price for natural gas. He simply argues that the city-gate price is a reasonable comparator for Nordic's cost of acquiring natural gas, to which its VCC is explicitly tied. At this stage, the court agrees. Taking the alleged facts in the light most favorable to Bickel, one could then reasonably expect Nordic's cost of acquisition to have some relation to the city-gate price.

Nordic urges, however, that even accepting Bickel's proposed comparisons, he has not stated a claim because the alleged overcharge is not enough to plausibly show a breach. Nordic notes that in some months, the overcharge factor is no more than one or 1.1 (equating to six to ten percent). But although the alleged VCC charge is no more than a few cents per therm during some months, there are other months in which Nordic appears to have charged nearly double the alleged correct VCC. (*See* Compl. [1] at 14–15.) The existence of the mechanism of a class action—often the only way to pursue recovery for class members whose individual harm may be *de minimis*—demonstrates that even a small overcharge can support a claim. The court declines to dismiss the breach of contract claim as implausible on the basis that during some months, overcharges-per-therm were minimal.

Nordic's motion to dismiss Bickel's claim for breach of the VCC provision of the contract is denied.

### 2. Breach of TSC Clause

Bickel contends that Nordic breached the contract with respect to the TSC clause as well. He asserts that Nordic breached the contract by adding "an outrageously high markup to the transportation and storage charges it incurs to provide its customers with energy supply." (*Id.* ¶ 9.) In asking the court to reject this claim, Nordic argues that it could not have breached because

11

the final clause in Bickel's contract states that "[i]nterstate transportation and capacity charges shall be billed to the Customer at the rate listed for Nordic Energy on the NIPSCO Choice website." (Mot. [17] at 4.) Nordic points out that Bickel has not alleged that the prices differed from what was posted on Nordic's website.

If this means that Nordic is free to charge whatever price it chooses, so long as it is posted on the website, the court does not agree. The contract contains no language granting Nordic such broad latitude. Instead, the contract provision Nordic cites immediately follows a sentence that cabins Nordic's discretion: "interstate transportation and capacity charges" are explicitly defined as "charges associated with gas delivery including interstate pipeline demand and capacity charges as well as interstate transportation and storage and related storage capacity charges and or the LDC established pipeline and storage mitigation services." (*Id.* at 4.) To adhere to the terms of the contract, the billing amount that Nordic posts to the NIPSCO Choice website must reflect those charges.

Next, Nordic argues that because the TSC provision is framed in terms of "charges" rather than "costs," it cannot be understood as "a promise to pass on only incurred 'costs'." (Reply [29] at 7–8.) Nordic notes that the contract uses the word "costs" when discussing the VCC, explicitly limiting the VCC to "Nordic's [incurred] cost to acquire your supply plus 25 cents per therm." In contrast, in reference to the TSC, the contract uses the word "*charges*"; in Nordic's view, that language choice allows for an additional profit-motivated markup. *See id.* at 2, 7–8*.* The argument has some plausibility, but Bickel offers a contrary interpretation that is reasonable as well: Bickel notes that Nordic has identified its markup explicitly in its pricing scheme for VCC as "25 cents per therm." Bickel contends that an ordinary customer would not recognize Nordic's proposed distinction between "costs" and "charges," and might reasonably assume that any profit-motivated markups on TSC would be identified as explicitly as the VCC markup. *See Four Seasons*, 870 N.E.2d at 501 ("The court must accept an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict.").

12

According to Bickel, the additional charges Nordic imposes are in fact "exorbitant markup[s]," resulting in customers paying Nordic significantly more than the transportation and service costs Nordic incurs. (Compl. [1] ¶ 53.) As compared to NIPSCO's charges for transportation and storage, he points to an average overcharge of 529% over the course of 23 months. (Opp'n [21] at 13.) He also contends that Nordic's TSC charges were more than 50 cents higher than all other ARES' transportation and storage charges for at least 9 months of his contract term. (Compl. [1] ¶ 54.) Nordic has not suggested that transportation and storage charges collected by NIPSCO or other ARESs are not fitting metrics for comparison. Bickel has therefore pleaded sufficient "factual content" to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

Nordic's motion to dismiss Bickel's claim for breach of the TSC provision of the contract is denied.

### 3. Implied Covenant of Good Faith and Fair Dealing

Nordic contends that Indiana law does not recognize the implied covenant of good faith and fair dealing outside the context of employment and insurance contracts. Nordic's position is only partially correct. It is true that Indiana law does not recognize an independent claim for breach of the implied covenant of good faith and fair dealing. IND. CODE § 26-1-1-203, cmt 1; *Spark Energy*, 440 F. Supp. 3d at 979 (explaining that there is no "independent cause of action for failure to perform in good faith" under Indiana law). To the extent that Bickel attempts to bring a separate claim for breach of the implied covenant, this claim is dismissed.

The court does not agree, however, with Nordic's contention that the court should not consider the implied covenant when evaluating Bickel's breach of contract claims. While it is true that the implied covenant has generally been limited to "insurance and employment contracts," the Seventh Circuit has also recognized its applicability where there is "ambiguity in how the provisions at issue were to be applied." *Partin v. Baptist Healthcare Sys., Inc.*, 135 F.4th 549, 562 (7th Cir. 2025) (citing *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011))

13

(affirming dismissal of a claim based on a breach of the implied covenant because the existence of a valid contract between the parties was uncertain, and, even if a contract did exist, the staffing agreement between two companies did not expressly create the covenant or contain obvious ambiguities); *see also Spark Energy,* 440 F. Supp. 3d at 979 ("[A]n implied covenant of good faith and fair dealing is imposed when a contract is ambiguous.").

Contrary to Nordic's assertions, "there is no absolute restriction [of claims based on the covenant] to employment and insurance contracts," and "[i]f the contract is ambiguous or expressly imposes such a duty on the parties, then the courts will impose such a duty [of good faith and fair dealing]." *Old Nat. Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015) (alteration in original) (citation omitted). As the case law shows (and Nordic itself acknowledges), such a claim can be brought when a term at issue in a contract of adhesion is ambiguous. (Reply [29] at 4, n.4.) For example, in *Old National Bank*, the court allowed claims for breach of the implied covenant of good faith and fair dealing to proceed against a bank, where the contracts were ones of adhesion "with terms not readily discernable to a layperson," and the defendant bank could not show that the contract "unambiguously and consistently provide[d] for the sums actually charged by the [b]ank." *Id.* at 531–32.

The contracts here are drafted by Nordic with terms not readily discernable to a layperson (for example "storage capacity charges," and "storage mitigation services"), and as the court has already observed, both the VCC and TSC clauses contain ambiguities in how each charge is calculated. Where such ambiguities exist, the Supreme Court of Indiana has reasoned that "the court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty." *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990) (finding that because two sophisticated business entities "entered into a lease contract clear in its terms and well understood in the business community," such ambiguity was not present and the covenant did not apply); *cf. Old Nat. Bank*, 31 N.E.3d at 532.

Consequently, while Bickel's claim for an independent breach of the implied covenant is dismissed, the covenant has application for Bickel's breach of contract claim, and the court will so instruct the jury. *See Spark Energy*, 440 F. Supp. 3d at 979–80 (applying the implied covenant to assess plaintiff's breach of contract claim and denying motion to dismiss where the claim arose from consumer contract for natural gas and language regarding rates was ambiguous).

Nordic's motion to dismiss Bickel's claim for breach of the implied covenant of good faith and fair dealing is thus granted, but the court will consider the implied covenant in assessing Bickel's breach of contract claims.

### 4. IDCSA Claim

Nordic argues that the IDCSA claim should be dismissed because it is (1) time-barred, (2) duplicative of the breach of contract claim, and (3) not pleaded with the particularity required by FED. R. CIV. P. 9(b). As explained below, none of those defenses requires dismissal of the IDCSA claim.

To successfully state such a claim, a plaintiff must allege a deceptive act that is either "uncured" (because defendant was put on notice of the deception but failed to correct it) or "incurable" (because defendant intended the deception). *Castagna v. Newmar Corp.*, No. 3:15-CV-249-TLS, 2016 WL 3413770, at *7 (N.D. Ind. June 22, 2016) (citing *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 647 (Ind. Ct. App. 2004)). Bickel alleges an incurable act, which is done "as part of a scheme, artifice, or device with intent to defraud or mislead." IND. CODE § 24-5-0.5-2(a)(8). To make out a claim of fraud, the heightened pleading standard of Rule 9(b) applies. *Spark Energy,* 440 F. Supp. 3d at 973. The complaint must identify the "who, what, when, where and how" of the alleged fraud in order to meet this heightened standard. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation and quotations omitted). The court balances this heighted federal procedural standard with the IDCSA's explicit substantive directive that its language is to "be liberally construed and applied to promote its

purposes and policies." IND. CODE § 24–5–0.5–1; *Elward v. Electrolux Home Prods., Inc.*, 264 F. Supp. 3d 877, 893 (N.D. Ill. 2017).

The timeliness argument bears only brief discussion. The IDCSA has a two-year statute of limitations that begins running at the occurrence of the deceptive act. IND. CODE § 24-5-0.5-3(a) (providing IDCSA claim "may not be brought more than two (2) years after the occurrence of the deceptive act"). The statute considers a wide range of acts to be deceptive, and any deceptive "act, omission, or practice" is a violation "whether it occurs, before, during, or after the transaction." IND. CODE § 24-5-0.5-5(a). Further, where "allegedly deceptive acts occur during a transaction that takes place over the course of more than one day, the statute of limitations is triggered by the date of each occurrence." *State v. Classic Pool & Patio, Inc.*, 777 N.E.2d 1162, 1166 (Ind. Ct. App. 2002) (reversing dismissal for defendant on statute of limitations because deceptive act occurred both at the time the contract was entered into and at the time the sale was tendered).

In light of these principles and the broad definition of what is deceptive for purposes of IDCSA, *see* IND. CODE § 24-5-0.5-3(a), the court concludes that Bickel's last charge from Nordic in January 2025 is an "occurrence" of a deceptive act, which makes his complaint, filed in April 2025, well within the two-year statute of limitations. *See Spark Energy,* 440 F. Supp. 3d at 975 ("Plaintiff has alleged a 'price gouging scheme' that continued from month to month, and that was deceptive based on statements that its pricing was based on market prices. Accordingly, the IDCSA claim will not be dismissed on grounds that it is untimely."). The court finds that Bickel can move forward with his claim for a violation of the IDCSA.[7]

Bickel is also correct that his allegations are sufficient to state an IDCSA claim separate from his breach of contract claim. The IDCSA prohibits a seller from committing "an unfair,

---

[7] The court notes that when evaluating timeliness of IDCSA claims, Indiana courts have evaluated each occurrence independently to assess whether the statute of limitations would bar suit as to each alleged violation. *E.g.*, *Classic Pool & Patio,* 777 N.E.2d at 1165–66. The parties here have not specifically addressed, nor does the court decide, how many of Bickel's payments fall within the two-year statute of limitations.

abusive, or deceptive act, omission, or practice in connection with a consumer transaction." IND. CODE § 24-5-0.5-3(a). The Indiana Supreme Court has held that a breach of contract claim is not sufficient on its own to establish a breach of the IDCSA, *see Zylstra v. DRV, LLC*, 8 F.4th 597, 610 (7th Cir. 2021) (citing *McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998)), but Bickel does more than just recite his breach of contract claim. He alleges that in its contract language, Nordic "affirmatively misrepresent[ed] that it would charge a rate based on the formulas in its contracts knowing full well that it would charge a much higher rate," and that Nordic "knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month." (Compl. [1] ¶¶ 30, 95.) He further alleges that via the "misleading omissions" of information that would be "material to any potential customer,"—including information that "Nordic's rates are substantially higher than those based on its acquisition costs," and that "Nordic adds an outrageous markup on the [TSC]—Nordic engaged in "a scheme, artifice, or device with intent to defraud or mislead." (*Id.* ¶¶ 97, 99, 100.) While several of the same facts also support his breach of contract claims, Bickel goes a step further by attaching these facts to the requisite scienter required to prove a violation of the IDCSA.

Nordic challenges these allegations as insufficient under the heightened pleading standard of Rule 9(b). *See Walkowiak v. Bridgepoint Educ., Inc.*, No. 2:16-CV-438, 2017 WL 2418391, at *2 (N.D. Ind. June 5, 2017) (citing *Lyons v. Leatt Corp.*, No. 4:15-cv-17-TLS, 2015 WL 7016469, at *4 (N.D. Ind. Nov. 10, 2015)); *see also McKinney v. State*, 693 N.E.2d 65, 67 (Ind. 1998). Under that Rule, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," but circumstances that constitute fraud or mistake must be pleaded "with particularity." FED. R. CIV. P. 9(b). The court concludes that Bickel has met that standard. He alleges that Nordic takes advantage of "information asymmetry" between itself and its customers to charge "excess rates, knowing that customers do not have ready access to data regarding these costs and charges nor the expertise to understand the data." (Compl. [1] ¶ 29.)

17

Similar to the plaintiff in *Spark Energy*, Bickel has alleged a scheme that is effectively a "bait-and-switch," 440 F. Supp. 3d at 976; (Compl. [1] ¶ 1), whereby Nordic induced customers to "rely" on a promise to charge prices tied to "formulas in its contracts knowing full well that it would charge a much higher rate." (Compl. [1] ¶¶ 95, 101.) Bickel has alleged that these deceptive acts arose both out of Bickel's initial contract with Nordic in 2022 and occurred during each monthly charge through February 2025, at which point Bickel cancelled his contract. (*Id.* ¶ 13.)

In light of "the IDCSA's directive to liberally construe its terms," *Elward v. Electrolux Home Prods., Inc.*, 264 F. Supp. 3d 877, 893 (N.D. Ill. 2017), the court finds that Bickel has effectively stated a claim for relief under the IDCSA. *See Hash v. First Fin. Bancorp*, No. 1:20-CV-1321 RLM-MJD, 2021 WL 859736 (S.D. Ind. Mar. 8, 2021) (finding IDCSA claim sufficient where plaintiff identified an alleged contractual representation, explained how defendant's actual fee practice differed, presented specific transactions where the wrong fee was charged, and alleged defendant's fraudulent intent).

Nordic's motion to dismiss Count II is denied.

### 5. Claims under Other State Consumer Protection Laws

Nordic alleges that Bickel has failed to state a claim under various states' consumer protection laws on behalf of consumers outside of Indiana because he fails "to allege deceptive action with any particularity." (Mot. [17] at 13–14.) The court agrees. On behalf of consumers in other states, Bickel makes claims supported only by conclusory allegations. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Bickel has provided a sufficient basis for his allegation that Nordic overcharged customers *in Indiana* via detailed comparisons of Nordic's TSC and VCC components for gas in Indiana against other utilities and wholesale prices. (Compl. [1] ¶¶ 41, 52.) But he has not presented a sufficient basis for a claim that Nordic also overcharged customers *in other states*. Those claims are dismissed without prejudice.

**B.     12(b)(1) Motion to Dismiss**

Because Nordic's Rule 12(b)(1) motion is based exclusively on Bickel's class claims for customers outside of Illinois, the motion is rendered moot. The court notes, however, that the issues raised in Nordic's motion are more appropriately addressed at the class certification stage, and not through a challenge to the court's subject matter jurisdiction. *See Block v. Lifeway Foods, Inc.*, No. 17 C 1717, 2017 WL 3895565, at *4 (N.D. Ill. Sept. 6, 2017) (Kennelly, J.) (denying motion to dismiss multi-state class claims because the question of whether a plaintiff can represent a multi-state class is better resolved at class certification); *In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-CV-5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017) (St. Eve, J.) (same).

## **CONCLUSION**

For the reasons explained here, Nordic's motion to dismiss under 12(b)(6) [17] is granted in part and denied in part. Bickel is granted leave to file an amended complaint within 21 days. Nordic's separate motion [18] to dismiss under 12(b)(1) is stricken as moot.

ENTER:

Dated: February 17, 2026

_____
REBECCA R. PALLMEYER
United States District Judge