**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**ANDREW BICKEL**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**NORDIC ENERGY SERVICES, LLC,**

Defendant.

Civil Case No: 25cv3454

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

PARTIES .......... 4

JURISDICTION AND VENUE .......... 4

Subject Matter Jurisdiction .......... 4

Personal Jurisdiction .......... 5

Venue .......... 5

FACTUAL ALLEGATIONS .......... 5

A. The History Of Deregulation And ARES' Role In Energy Markets. .......... 5

B. Nordic Exploits Its Customers. .......... 8

C. Plaintiff Bickel's Dealings With Nordic Are Typical .......... 9

D. Nordic Overcharged For The Variable Commodity Component Of Its Rate. .......... 10

E. Nordic Overcharged For The Transportation And Storage Component Of The Variable Rate. .......... 13

CLASS ACTION ALLEGATIONS .......... 17

CAUSES OF ACTION .......... 20

COUNT I .......... 20

COUNT II .......... 23

COUNT III .......... 27

PRAYER FOR RELIEF .......... 28

JURY DEMAND .......... 28

Plaintiff Andrew Bickel ("Plaintiff"), by his attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, Wittels McInturff Palikovic and Carroll Shamberg LLC, brings this proposed class action in his individual capacity, and on behalf of a class of customers defined below, against Defendant Nordic Energy Services, LLC (hereinafter "Nordic" or "Defendant") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

1. This action seeks to redress Nordic's breach of contract and deceptive bait-and-switch scheme that has caused thousands of commercial and residential energy customers in Indiana to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2. Nordic is an alternative retail energy supplier ("ARES") that competes with local utilities to supply electricity and natural gas in deregulated energy markets across the United States. Nordic is just a commodities broker. It buys energy on the wholesale market and resells it to customers at a markup, providing no additional value. It does not produce or deliver the energy it supplies to customers.

3. To entice customers into buying its natural gas and electricity supply, Nordic offers customers a fixed supply rate for a few months, to be followed by a variable supply rate. Nordic represents in its uniform customer contracts that its natural gas and electricity rates will be comprised of two components. The first component is for the price of the actual natural gas or electricity Nordic supplies to customers' homes or business. At the beginning of the contract term (which automatically renews until a customer cancels), that rate is fixed at a specific dollar amount per therm (for natural gas) or per kWh (for electricity). After the initial fixed term expires, Nordic promises that customers will pay a variable supply rate based on Nordic's cost to acquire the

natural gas or electricity supply, plus a markup of a set number of cents per therm or kWh (the "Variable Commodity Component"). The second component is comprised of the charges Nordic has to pay for transportation and storage fees for the energy commodity it supplies (the "Transportation and Storage Component").

4. Plaintiff's contract with Nordic is typical, providing that:

> Nordic Energy agrees to act as Customer's exclusive natural gas supplier as set forth in this Agreement and is offering Customer a fixed rate of $.0990 per therm for your metered usage for the first three (3) months of the term, for your natural gas, plus the other charges outlined below associated with gas delivery and storage. After that, the price will be a variable price equal to Nordic's cost to acquire your supply plus 25 cents per therm. Please note that the fixed price and the variable price apply only to the price of natural gas, not to the other charges associated with gas delivery including interstate pipeline demand and capacity charges as well as interstate transportation and storage and related storage capacity charges and or the LDC established pipeline and storage mitigation services.

5. Any reasonable consumer, including Plaintiff, would reasonably expect that the Variable Commodity Component would be "equal to Nordic's cost to acquire your supply plus 25 cents per therm" and that it would only vary in accordance with Nordic's supply costs. Nordic's contract does not give Nordic any discretion to set the Variable Commodity Component as it sees fit.

6. However, such a reasonable consumer would be deceived by Nordic's promise to base the Variable Commodity Component just on its costs to acquire energy plus the fixed adder. In reality, the Variable Commodity Component of Nordic's rates are substantially higher than its costs to acquire energy plus the specified fixed adder.

7. Moreover, Nordic represents that supply prices are in addition to "other charges associated with gas delivery," namely the transportation and storage charges listed in the contract. Any reasonable consumer would understand and expect that Nordic's Transportation and Storage

Component would only be comprised of those charges Nordic (who does not transport or store the energy it supplies) pays third parties, without any markup.

8. To that end, Plaintiff's utility bill reflected two components for Nordic's gas supply: "Gas Supply," *i.e.* the fixed rate for supply followed by the Variable Commodity Component, and "Interstate Transportation and Storage Charges," *i.e.* the Transportation and Storage Component.

9. Unfortunately, such a reasonable consumer would be deceived. In fact, Nordic adds an outrageously high markup to the transportation and storage charges it incurs to provide its customers with energy supply.

10. As a result of Nordic's breach of contract and deceptive practices, thousands of Indiana customers have been, and continue to be, fleeced by Nordic out of millions of dollars in exorbitant charges for electricity and natural gas. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

11. Plaintiff and other Nordic customers in Indiana (the "Class") have been injured by Nordic's unlawful practices. Plaintiff and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Nordic's breach of contract and, to the extent any pricing term is found ambiguous, Nordic's failure to perform it in accordance with the duty of good faith and fair dealing, violation of Indiana consumer protection statutes, and unjust enrichment.

12. Only through a class action can Nordic's Indiana customers remedy its ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Nordic's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further,

many customers do not realize they are victims of Nordic's deceptive and unlawful conduct. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Nordic honor the terms of their customer contracts.

## PARTIES

13. Plaintiff Andrew Bickel resides in Demotte, Indiana. Plaintiff enrolled with Nordic in or around April 2022. Nordic charged Mr. Bickel a fixed rate for his natural gas supply from in or around April 2022 until in or around July 2022, after which it began charging the Variable Commodity Component. Plaintiff cancelled his Nordic account in or around February 2025. Nordic charged Plaintiff excessive and unauthorized rates for the Variable Commodity Component and the Transportation and Storage Component nearly every month. As a result of Nordic's unauthorized and unlawful conduct, Mr. Bickel paid substantially more for his home natural gas supply than he otherwise should have paid.

14. Defendant Nordic is an independently owned Illinois limited liability company with its principal place of business in Oakbrook, Illinois.

## JURISDICTION AND VENUE

***Subject Matter Jurisdiction***

15. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and at least one Defendant.

***Personal Jurisdiction***

16. This Court has General Personal Jurisdiction over Defendant because it is an Illinois limited liability company whose principal place of business is in Illinois, and it advertises, markets, distributes, and sells energy to Illinois customers.

***Venue***

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Defendant is a limited liability company that is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because Defendant is subject to this Court's personal jurisdiction, it resides in this District and venue therefore is proper in this District under § 1391(b)(1). Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois; it is from Illinois that Defendant's deceptive marketing emanates; Defendant's decisions to overcharge Plaintiff and the class were made in Illinois; and Defendant obtained its ill-gotten gains in Illinois.

## FACTUAL ALLEGATIONS

### *A. The History Of Deregulation And ARES' Role In Energy Markets.*

18. In the 1990s and 2000s, numerous states deregulated their markets for retail energy. In 1997, Indiana deregulated the market for natural gas supply.[1] Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay. Deregulation laws in other states are substantially similar.

---

[1] *See NIPSCO Natural Gas Choice Program*, Indiana Office of Utility Consumer Counselor, https://www.in.gov/oucc/natural-gas/tips-and-publications/nipsco-natural-gas-choice-program/ (last visited March 28, 2025).

19. Since Indiana opened its retail natural gas markets to competition, numerous residential and small business customers have switched to an ARES.

20. ARES, the new energy suppliers, compete primarily against local utilities. ARES purchase energy directly or indirectly from companies that produce energy. ARES then sell that energy to end-user customers. However, ARES do not deliver energy to customers' homes and businesses, and many do not produce electricity or extract natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ARES merely buy electricity and natural gas and then sell that energy to end-users with a mark-up. Thus, ARES are essentially brokers and traders: they neither produce nor deliver electricity or natural gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ARES sets the price for the customer's energy supply. The only value that ARES add in the energy markets is their ability to reduce customers' costs compared to what available alternatives like local utilities charge. Absent such savings, ARES merely siphon money from end users in the form of increased (and unnecessary) charges.

21. ARES are subject to minimal regulation by state utility regulators like the Indiana Utility Regulatory Commission ("IURC"). ARES like Nordic do not have to file or seek approval for the rates they charge or the methods by which they set their rates with the IURC.[2] Instead, an ARES customer's rates are governed by the contract between the ARES and the customer (and the relevant consumer protection and contract laws).

---

[2] *Id.* ("If you participate in the NIPSCO Choice program, the terms of your gas supply service (including the price you are charged and length of the agreement) will be dictated by a contract between you and the alternative supplier rather than regulated utility rates…Prices in alternative supplier contracts are not subject to IURC approval.").

22. Customers who do not choose to switch to an ARES for their energy supply continue to receive their supply from their local utility, such as the Northern Indiana Public Service Company ("NIPSCO").

23. The supply costs utilities like NIPSCO and ARES like Nordic pay for natural gas are primarily based on two components: the commodity price of natural gas on a per-therm basis, and the cost associated with transportation and storage of natural gas. Utilities and ARES can purchase natural gas and pay for storage and transportation costs on the same open and competitive market. Costs for supplying electricity are substantially similar.

24. Notably, "NIPSCO does not mark up the price it pays for securing the natural gas used by homes and businesses, and customers pay the same dollar-for-dollar cost NIPSCO pays."[3]

25. The same is true for other utilities in Indiana. "Natural gas utilities [in Indiana] buy gas for their customers in a competitive wholesale market . . . Utilities may recover wholesale gas costs on a dollar-for-dollar basis but may not profit on them . . . a utility must demonstrate that it has shopped prudently in the competitive market."[4] The same is true for utilities in other states.

26. ARES like Nordic can purchase wholesale energy and pay for the charges associated with transportation and storage using the exact same wholesale market as utilities. ARES like Nordic can also pay the exact same prices. But ARES such as Nordic have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance, such as by purchasing futures

---

[3] https://www.nisource.com/news/article/newly-approved-nipsco-gas-rates-to-take-effect-beginning-in-august-2024 (last visited March 28, 2025).

[4] https://www.in.gov/oucc/natural-gas/key-cases-by-utility/nipsco-gas-rates/#Gas_Costs (last visited March 28, 2025).

contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ARES to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

***B. Nordic Exploits Its Customers.***

27. Because of their increased flexibility, ARES like Nordic can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Nordic's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the energy acquisition costs to which Nordic's contract ties its rates.

28. Instead, Nordic's rates are the result of unbridled price gouging and profiteering. Nordic does not have discretion to add whatever markup it chooses under the contract.

29. Nordic took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Nordic exploits deregulated markets by consistently charging its customers far more than its contractual pricing terms permit and failing to adequately disclose how its rates are actually determined. Customers like Plaintiff do not have ready access to information regarding the market costs for energy supply, or for transportation and storage costs, and thus Nordic can and does take advantage of this information asymmetry by charging excess rates, knowing that customers do not have ready access to data regarding these costs and charges nor the expertise to understand that data.

30. In this case, Nordic knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

31. It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[5] and "Nudges."[6]

32. Nordic did not adequately disclose to Plaintiff that its variable energy rates are consistently and significantly higher than the rates it promised it would charge.

33. Nordic's omissions with respect to the rates it would charge were both material and deceptive.

### *C. Plaintiff Bickel's Dealings With Nordic Are Typical.*

34. In early-to-mid 2022, Nordic solicited Plaintiff Bickel, and he agreed to switch his natural gas supplier to Nordic. As part of the enrollment process, Nordic provided Plaintiff with Nordic's standard customer contract.

35. Nordic began supplying natural gas to Plaintiff Bickel's residence and it continued to do so until he cancelled in or around February 2025. As detailed below, Nordic overcharged Plaintiff every month he was a customer, in direct contravention of the promises Nordic made to Plaintiff and other customers.

36. The customer agreement also provided Mr. Bickel, like all other members of the class, with a five-day recessionary period during which he could rescind the contract prior to its

[5] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," The Journal of Economic Perspectives, Vol. 5, pp. 193–206.

[6] R. Thaler and S. Sunstein (2008), Nudge, Yale University Press.

commencement should he not agree to its terms. During that recessionary period, the contract served as a solicitation in which Nordic identified the basis upon which the promised market-based variable rate would be determined.

***D. Nordic Overcharged For The Variable Commodity Component Of Its Rate.***

37. In its contracts, Nordic represents that after the expiration of any fixed rate term, the Variable Commodity Component will be equal to Nordic's cost to acquire energy, plus a set adder per therm or kilowatt hour. In Plaintiff's case, that was 25 cents per therm.

38. Plaintiff of course does not have access to Nordic's actual costs. However, publicly available data regarding the market commodity costs for natural gas in the same market and at the same time as Nordic purchased natural gas for Plaintiff demonstrates that the Variable Commodity Component of Nordic's variable rate is not in fact based on its costs to acquire natural gas plus a 25 cent adder.

39. The table below identifies (i) the Variable Commodity Component Nordic charged Plaintiff from March 2023 to January 2025, (ii) the corresponding market commodity price for natural gas based on the Natural Gas Citygate Price in Indiana,[7] plus 25 cents per therm, and (iii) the overcharge factor:

| Month | Nordic Variable Commodity Component | Market Gas Supply Price + 25 cents/Therm | Nordic Overcharge Factor |
|---|---|---|---|
| Mar-23 | $0.81 | $0.47 | 1.7 |
| Apr-23 | $0.69 | $ 0.46 | 1.5 |
| May-23 | $0.67 | $0.46 | 1.5 |
| Jun-23 | $0.69 | $0.46 | 1.5 |
| Jul-23 | $0.63 | $0.50 | 1.3 |
| Aug-23 | $0.54 | $0.50 | 1.1 |
| Sep-23 | $0.56 | $0.51 | 1.1 |
| Oct-23 | $0.59 | $0.54 | 1.1 |
| Nov-23 | $0.63 | $ 0.51 | 1.2 |
| Dec-23 | $0.62 | $ 0.50 | 1.3 |
| Jan-24 | $0.63 | $0.56 | 1.1 |

[7] https://www.eia.gov/dnav/ng/hist/n3050in3m.htm (last visited March 28, 2025).

| Month | Nordic Variable Commodity Component | Market Gas Supply Price + 25 cents/Therm | Nordic Overcharge Factor |
|---|---|---|---|
| Feb-24 | $0.84 | $0.42 | 2.0 |
| Mar-24 | $0.67 | $0.39 | 1.7 |
| Apr-24 | $0.48 | $0.41 | 1.2 |
| May-24 | $0.49 | $0.46 | 1.1 |
| Jun-24 | $0.50 | $0.50 | 1.0 |
| Jul-24 | $0.49 | $0.45 | 1.1 |
| Aug-24 | $0.57 | $0.44 | 1.3 |
| Sep-24 | $0.55 | $0.47 | 1.2 |
| Oct-24 | $0.57 | $ 0.46 | 1.2 |
| Nov-24 | $0.70 | $0.46 | 1.5 |
| Dec-24 | $0.74 | $0.54 | 1.4 |
| Jan-25 | $0.79 | $0.65 | 1.2 |

40. The "city gate" is the point where natural gas is transferred from an interstate or intrastate pipeline to a local natural gas utility. The "city gate price" is the sales price of the natural gas at this point: the price reflects the wholesale/wellhead price as well as the cost of transporting the natural gas by pipeline to the citygate (but not from the citygate to the end-user retail customer). ARES like Nordic can purchase natural gas at these prices, or they can use alternative purchasing strategies to obtain an even lower price.

41. Accordingly, the fact that the citygate price, even when adding 25 cents per therm, is almost always substantially lower than the Variable Commodity Component of Nordic's variable rate shows that Nordic is charging a rate that is much higher than allowed under the contract.

42. Moreover, publicly available data on the local utilities' rates, like NIPSCO, which is the utility serving Plaintiff's home, serve as an ideal indicator of whether Nordic's customers are actually being charged based on commodity costs plus the markup. This is because the utilities' energy procurement costs are the same procurement costs ARES like Nordic incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Nordic's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply

customers with energy, which is what Nordic also does. Consequently, local utilities' supply rates are an apt comparator for determining (at least at the pleading stage) whether the Variable Commodity Component of Nordic's variable rates are actually based on Nordic's energy acquisition costs.

43. In fact, Nordic has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Nordic's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate if not lower. Using the utility's rates as a benchmark for Nordic's rates shows that Nordic's rates were driven by excessive mark-ups and profiteering.

44. The following table compares the Variable Commodity Component of Nordic's variable rates charged to Plaintiff to NIPSCO's corresponding commodity supply rates.

| Month | Nordic Variable Commodity Component ($/Therm) | NIPSCO Gas Supply Price + 25 cents/Therm ($/Therm) | Nordic Overcharge Factor |
|---|---|---|---|
| Mar-23 | $0.81 | $0.70 | 1.2 |
| Apr-23 | $0.69 | $0.54 | 1.3 |
| May-23 | $0.67 | $0.49 | 1.4 |
| Jun-23 | $0.69 | $0.37 | 1.8 |
| Jul-23 | $0.63 | $0.37 | 1.7 |
| Aug-23 | $0.54 | $0.35 | 1.5 |
| Sep-23 | $0.56 | $0.38 | 1.5 |
| Oct-23 | $0.59 | $0.44 | 1.3 |
| Nov-23 | $0.63 | $0.54 | 1.2 |
| Dec-23 | $0.62 | $0.60 | 1.0 |
| Jan-24 | $0.63 | $0.57 | 1.1 |
| Feb-24 | $0.84 | $0.58 | 1.4 |
| Mar-24 | $0.67 | $0.49 | 1.4 |
| Apr-24 | $0.48 | $0.42 | 1.1 |
| May-24 | $0.49 | $0.40 | 1.2 |
| Jun-24 | $0.50 | $0.39 | 1.3 |
| Jul-24 | $0.49 | $0.40 | 1.2 |
| Aug-24 | $0.57 | $0.39 | 1.5 |
| Sep-24 | $0.55 | $0.39 | 1.4 |
| Oct-24 | $0.57 | $0.43 | 1.3 |
| Nov-24 | $0.70 | $0.47 | 1.5 |

| Month | Nordic Variable Commodity Component ($/Therm) | NIPSCO Gas Supply Price + 25 cents/Therm ($/Therm) | Nordic Overcharge Factor |
|---|---|---|---|
| Dec-24 | $0.74 | $0.52 | 1.4 |
| Jan-25 | $0.79 | $0.55 | 1.4 |

45. This table demonstrates the drastic difference between Nordic's Variable Commodity Component rates for Plaintiff's account and NIPSCO's corresponding commodity supply rates, even when accounting for the 25 cent per therm markup.[8]

46. The local utility's rates are a reasonable, pre-discovery benchmark of a rate that is based on energy acquisition costs. As explained above, the local utility is Nordic's primary competitor in Plaintiff's service territory, and the local utility's supply rate reflects the same commodity cost that ARES like Nordic incur in Indiana. Thus, the utility's rate is an ideal benchmark for a rate that was calculated in accordance with the pricing term in Nordic's customer contract.

47. The discrepancy between the utility's rates and Nordic's rates is thus attributable to Nordic's failure to base the Variable Commodity Component of the rate on its energy acquisition costs (plus the markup).

48. Nordic fails to inform its customers that it will charge more for the Variable Commodity Component than its actual costs plus 25 cents per therm. No consumers would enroll with Nordic if they knew about this practice.

### *E. Nordic Overcharged For The Transportation And Storage Component Of The Variable Rate.*

[8] https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/gas-rates/2024-current/historical/historical-commodity-cost-of-gas.pdf?sfvrsn=6b8be751_9 (last visited March 28, 2025).

49. Nordic also uses the Transportation and Storage Component to price gouge its customers. For example, and typical of other Class members' contracts, Nordic stated in Plaintiff's contract that "the fixed and the variable price apply only to the price of natural gas, not to the other charges associated with gas delivery including interstate pipeline demand and capacity charges as well as interstate transportation and storage and related storage capacity charges and or the LDC established pipeline and storage mitigation services."

50. Any reasonable consumer would understand from the plain language of this pricing term that Nordic would pass through the transportation and storage charges it incurs to supply its customers with natural gas, with no markup. Unfortunately, such a consumer would be deceived.

51. In fact, Nordic adds an outrageously high markup to the transportation and storage charges it incurs to provide its customers with energy supply.

52. For example, NIPSCO's charges to customers for storage and transportation charges are always substantially lower than the Transportation and Storage Component charges Nordic charged Plaintiff:

| **Month** | **Nordic Energy Int. State Transp. & Storage Price ($/Therm)** | **NIPSCO Int State Demand, Transm & Storage Price ($/Therm)[9]** | **Nordic Overcharge Factor** |
|---|---|---|---|
| Feb-23 | $0.61 | $0.06 | 10 |
| Mar-23 | $0.61 | $0.07 | 9 |
| Apr-23 | $0.61 | $0.10 | 6 |
| May-23 | $0.61 | $0.18 | 3 |
| Jun-23 | $0.61 | $0.37 | 2 |
| Jul-23 | $0.61 | $0.40 | 2 |
| Aug-23 | $0.61 | $0.40 | 2 |
| Sep-23 | $0.60 | $0.35 | 2 |
| Oct-23 | $0.60 | $0.13 | 4 |
| Nov-23 | $0.60 | $0.09 | 7 |
| Dec-23 | $0.60 | $0.05 | 11 |
| Jan-24 | $0.60 | $0.05 | 11 |
| Feb-24 | $0.60 | $0.05 | 12 |

[9] https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/gas-rates/2024-current/historical/historical-commodity-cost-of-gas.pdf?sfvrsn=6b8be751_9 (last visited March 28, 2025).

| Month | Nordic Energy Int. State Transp. & Storage Price ($/Therm) | NIPSCO Int State Demand, Transm & Storage Price ($/Therm)[9] | Nordic Overcharge Factor |
|---|---|---|---|
| Mar-24 | $0.60 | $0.07 | 9 |
| Apr-24 | $0.60 | $0.07 | 9 |
| May-24 | $0.60 | $0.14 | 4 |
| Jun-24 | $0.60 | $0.30 | 2 |
| Jul-24 | $0.60 | $0.31 | 2 |
| Aug-24 | $0.60 | $0.30 | 2 |
| Sep-24 | $0.60 | $0.25 | 2 |
| Oct-24 | $ 0.60 | $0.10 | 6 |
| Nov-24 | $ 0.60 | $0.08 | 7 |
| Dec-24 | $ 0.60 | $0.05 | 12 |
| Jan-25 | $ 0.60 | $0.04 | 15 |

53. There is no good faith justification for the disparity in Nordic's Transportation and Storage Component. NIPSCO and ARES like Nordic sell the same commodity, in this case natural gas, they use the same pipelines and storage facilities to do so, and they are charged and pay for transportation and storage in the same open and competitive market. In other words, these storage and transportation charges are for the same services in the same market, and thus there is no justification for the substantial disparity between NIPSCO's and Nordic's storage and transportation charges to customers. Plainly, Nordic's Transportation and Storage Component charges include an exorbitant markup.

54. Nordic's Transportation and Storage Component charges are also substantially higher than those of other ARES, even though they incur the exact same costs on the exact same market. For example, in February 2023, the 60 cents per therm Nordic charged Plaintiff for the Transportation and Storage Component was more than 50 cents higher than all of the other ARES' transportation and storage charges listed on NIPSCO's information webpage.[10] The same was

[10] https://web.archive.org/web/20230216123322/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

true in March 2023[11], June 2023[12], September 2023[13], February 2024[14], May 2024[15], August 2024[16], December 2024[17], and February 2025.[18] Nordic overcharges its customers for the Transportation and Storage Component whether they are on the fixed rate or the variable rate for commodity pricing.

55. The disparity between the storage and transportation charges NIPSCO and other ARES charges versus those Nordic charges proves that Nordic is charging its customers more than just the storage and transportation charges it incurs. Instead, Nordic adds a substantial markup in direct contravention of its customer contracts.

56. Nordic fails to inform its customers that it will charge a substantial markup on the transportation and storage costs it incurs, sometimes fifteen times higher than the costs it actually incurs. No customer would enroll with Nordic if they knew the truth about this practice.

57. Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine

[11] https://web.archive.org/web/20230327123532/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[12] https://web.archive.org/web/20230615140520/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[13] https://web.archive.org/web/20230909200607/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[14] https://web.archive.org/web/20240203225620/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[15] https://web.archive.org/web/20240519115145/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[16] https://web.archive.org/web/20240821095746/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[17] https://web.archive.org/web/20241205110833/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

[18] https://web.archive.org/web/20250214160205/https://www.nipsco.com/bills-and-payments/billing-programs/choice (last visited March 28, 2025).

applies, effectively tolling the limitations period until the date of Nordic's last wrongful act against Plaintiff, when Nordic last charged Plaintiff substantially more for energy than it promised.

## CLASS ACTION ALLEGATIONS

58. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all Indiana residential and commercial customers of Nordic whose contracts have either a Variable Commodity Component or a Transportation and Storage Component from the earliest allowable date through the date of judgment (the "Class").

59. As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant. Defendant has engaged in uniform and standardized conduct toward the Class—charging more than its contracts allow—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers. Defendant's conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.

60. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

61. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files his motion for class certification.

62. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Nordic. Plaintiff believes, however, that based on the publicly available data

concerning Nordic's customers in Indiana, the Class encompasses at least thousands of individuals whose identities can be readily ascertained from Nordic's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

63. The Class is ascertainable because its members can be readily identified using data and information kept by Nordic in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

64. Plaintiff is an adequate class representative. His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the Defendant. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Nordic's conduct.

65. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

66. Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a. Whether Nordic's misrepresentations and omissions are materially deceptive;

b. Whether Nordic breached its contract with Plaintiff and Class Members by failing to set prices and charges in the method dictated by the parties' contract;

c. Whether, to the extent any pricing term in its contract with Plaintiff and Class Members is found ambiguous, Nordic's performance was not consistent with the interpretation of the pricing term that the parties would have agreed to and intended had they been acting consistent with the duty of good faith and fair dealing;

d. Whether Nordic's conduct violates various state consumer protection and unfair competition statutes;

e. Whether Nordic was unjustly enriched as a result of its conduct; and

f. Whether, and to what extent, equitable relief should be imposed on Nordic to prevent it from continuing its unlawful practices.

67. A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

68. A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

69. A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

70. Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a. Whether Nordic's misrepresentations and omissions are materially deceptive;

b. Whether Nordic breached its contract with Plaintiff and Class Members by failing to set prices and charges in the method dictated by the parties' contract;

c. Whether, to the extent any pricing term in its contract with Plaintiff and Class Members is found ambiguous, Nordic's performance was not consistent with

the interpretation of the pricing term that the parties would have agreed to and intended had they been acting consistent with the duty of good faith and fair dealing in its customer contracts;

d. Whether Nordic's conduct violates various state consumer protection and unfair competition statutes; and

e. Whether Nordic was unjustly enriched as a result of its conduct.

71. Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
***Breach Of Contract***
***(On Behalf Of The Class)***

72. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

73. Plaintiff and the Class entered into valid contracts with Nordic for the provision of electricity and/or natural gas supply. Those non-negotiable contracts were drafted solely by Nordic and imposed on customers on a take-it-or-leave-it basis, giving customers no meaningful opportunity to negotiate their terms.

74. Nordic promises in its customer contract that price will be based on a fixed supply rate, or a variable supply rate equal to its supply costs, plus a pre-determined markup.

75. Nordic also promises in its contract that customers, whether they are paying a fixed or variable rate for supply, will be charged for the transportation and storage charges Nordic incurs to supply natural gas or electricity.

76. Upon information and belief, Plaintiff was subject to the same or substantially similar contractual terms as thousands of other Nordic variable rate customers in Indiana.

77. Pursuant to the contracts, Plaintiff and the Class paid the variable rates Nordic charged for natural gas and electricity.

78. However, Nordic failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts. Instead, Nordic charged rates for natural gas and electricity that were untethered from the formula

79. Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Nordic charged a rate calculated from the formula identified in Nordic's customer contract.

80. By reason of the foregoing, Nordic is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Nordic's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

81. Additionally, if there is any ambiguity in how any of the terms in the contract are to be applied, every contract contains an implied covenant of a duty of good faith and fair dealing in the performance and enforcement of the contract. This duty applies with particular force here, where Nordic's contracts are adhesion contracts containing terms not readily discernible to a layperson—including undefined terms such as "storage capacity charges" and "storage mitigation services"—and where Nordic, as the sole drafter, bore responsibility for the precision of the language it chose.

82. Nordic was thus required to perform the contract's pricing obligations in a manner consistent with what the parties, acting reasonably and in good faith, must be presumed to have intended. Nordic's actual conduct was irreconcilable with any such reasonable, good-faith understanding of the contract terms. Nordic has at all times known (i) that its variable supply rates and its transportation and storage charges were consistently and significantly higher than any

reasonable application of the contractual pricing formula would permit; (ii) that customers lacked ready access to information about Nordic's actual acquisition costs or the transportation and storage charges it pays third parties, or the expertise to identify the discrepancy between the promised formula and the rates actually charged, and that Nordic exploited this information asymmetry to charge excess rates with impunity; (ii) that customers paying Nordic's energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates; (iv) that Nordic could, but failed to, provide customers with adequate advance notice of the rates it would charge; and (iv) that Nordic could, but failed to, adequately disclose that it was adding undisclosed markups to charges that were supposed to be pass-throughs of Nordic's costs, and the contract's own structure—which specified an explicit markup only for the variable supply component—gave customers no reason to expect on the transportation and storage component. Despite this superior knowledge, Nordic acted with a bad motive and continued to gouge customers and small businesses.

83. Nordic's failure to disclose this material information is what permitted Nordic to charge Plaintiff and Class Members excessive rates—unburdened by disclosing the truth about its rate setting practices—and Plaintiff experienced the adverse consequences in the performance of the parties' agreement.

84. Plaintiff and Class Members reasonably expected, based on the plain language of Nordic's contracts, that Nordic's Variable Commodity Component would be based on Nordic's acquisition costs plus the specified per-unit markup, and that the Transportation and Storage Component would reflect only charges Nordic paid without a markup. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Nordic.

85. Plaintiff and Class Members also reasonably expected that Nordic would not exploit its position as the sole drafter of an adhesion contract to impose charges dramatically in excess of any reasonable construction of the agreed-upon pricing formula.. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Defendant.

86. To the extent the covenant applies, Nordic violated it by performing the contract in a manner that frustrated Plaintiff's and other Class Members' reasonable expectations under the pricing terms.

87. As a result of Nordic's breach of contract and, to the extent any pricing term is found ambiguous, its failure to perform it in accordance with the duty of good faith and fair dealing, Nordic is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial.

**COUNT II**

***Violation Of Ind. Code Ann. § 24-5-0.5, et seq.***
***(On Behalf Of The Class)***

88. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89. Defendant's violations of Ind. 24-5-0.5, *et seq.* are applicable to all Class Members, respectively, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

90. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91. The Indiana Deceptive Consumer Sales Act ("IDSCA") prohibits a "supplier" from committing:

> An unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Ind. Code Ann. § 24-5-0.5-3.

92. Defendant intentionally deceived Plaintiff and the Class by affirmatively misrepresenting that it would charge a rate based on the formulas in its contracts knowing full well that it would charge a much higher rate. These affirmative misrepresentation constitute an unfair, abusive, or deceptive act or practice in connection with a consumer transaction and thus violates the IDCSA.

93. Nordic first made these unfair, false, deceptive, and misleading affirmative misrepresentations prior to the conclusion of the rescissionary period of the contract, during which Nordic's contract served as a solicitation. The agreement is not legally binding on Plaintiff prior to the expiration of the rescissionary period. Thus, the contract is an advertisement in which Nordic misrepresents that the energy rates will be based upon the formula set forth in its customer contract.

94. Defendant also made unfair, false, deceptive, and misleading omissions with respect to the rates charged for electricity and natural gas which constitute an unfair, abusive, or deceptive omission or practice in connection with a consumer transaction and thus violates the IDCSA, including:

a. Failing to inform potential customers that Nordic would charge a rate much higher than it promised;

b. Failing to inform customers that Nordic's rates are substantially higher than those based on its acquisition costs, even when accounting for the markup on the Variable Commodity Component;

c. Failing to inform customers that Nordic adds an outrageous markup on the Transportation and Storage Component;

d. Failing to adequately disclose that Nordic's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

e. Failing to adequately disclose that customers paying Nordic's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates; and

f. Failing to disclose that Nordic's rates are artificially inflated to maximize profits at the expense of its customers.

95. Each of the omissions above constitutes an unfair, abusive, or deceptive act or practice in connection with a consumer transaction and thus violates the IDCSA.

96. This omitted information would have been material to any potential customer, as was the false information Nordic affirmatively conveyed.

97. Defendant's unfair, false, deceptive, and misleading statements and omissions were connected to a scheme, artifice, or device with intent to defraud or mislead.

98. Defendant made these unfair, false, deceptive, and misleading statements and omissions with the intent that customers rely upon such statements.

99. Defendant's price gouging scheme, which often affects Indiana's most vulnerable citizens, is unfair, immoral, unethical, oppressive, and unscrupulous. Victims of Nordic's scheme cannot avoid it; once Nordic has charged its exorbitant rate, customers can only pay the amount charged or risk having their natural gas and/or electricity shut off. This can be a life-threatening issue in the depths of the summer and winter. Moreover, Nordic's customers are not informed that Nordic is price gouging them, and reasonable customers reasonably trust that the ARES providing them service will not charge a rate divorced from supply costs about which they are not, as private individuals, ordinarily privy.

100. Defendant's price gouging scheme offends public policy as well. The purpose of deregulation is to allow ARES like Nordic to offer competitive rates to the benefit of customers.

Nordic offers nothing of value to customers; instead, it callously takes advantage of deregulation, and the difficulty customers face in determining when market prices change such that a market variable rate should be higher or lower, to charge outrageously high rates, secure in the knowledge that the public utility commission has no authority to curb its behavior.

101. Nordic's price gouging causes customers significant and substantial pecuniary injury.

102. Plaintiff and other Class Members entered into agreements to purchase natural gas and electricity from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Indiana Deceptive Consumer Sales Act.

103. As a consequence of Defendant's wrongful actions, Plaintiff and the other Class Members suffered an ascertainable monetary loss based on the difference in the prices and charges they paid versus the prices and charges they would have paid had Defendant imposed prices and charges based on the contract formula or had they not switched to Defendant from their previous supplier.

104. Plaintiff and other Class Members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase natural gas and/or electricity from Defendant if the true facts concerning its prices and charges had been known.

105. By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for trebled compensatory damages; punitive damages; attorneys' fees; and the costs of this suit.

106. Defendant knows full well that its prices and charges are unconscionably high, and the misrepresentations it makes with regard to the prices and charges being based on acquisition costs and charges based on transportation and storage charges were made for the sole purpose of

inducing consumers to purchase natural gas and/or electricity from it so it can reap outrageous profits to the direct detriment of Indiana consumers and without regard to the consequences high utility bills cause such consumers. Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Class Members. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

**COUNT III**
***Unjust Enrichment***
(On Behalf Of The Class)

107. Plaintiff re-alleges and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

108. This cause of action is pleaded in the alternative to Plaintiff's contract claims. To the extent the Court determines that a valid contract exists between the parties, Plaintiff does not intend to proceed with their unjust enrichment claim.

109. Plaintiff and the Class Members conferred a tangible economic benefit upon Nordic by contracting with Nordic for electricity or natural gas. Plaintiff and the Class would not have contracted with Nordic for electricity and/or natural gas had they known that Nordic would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

110. Plaintiff and the Class Members would not have purchased energy from Nordic had they known the truth about Nordic's energy prices and charges.

111. By engaging in the conduct described above, Nordic has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

112. It would be unjust and inequitable for Nordic to retain the payments Plaintiff and Class Members made for excessive energy prices and charges.

113. Therefore, Nordic is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Nordic's actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

b) Find and declare that Defendant has breached its contracts with the Class;

c) Render an award of compensatory damages, the precise amount of which is to be determined at trial;

d) Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

e) Render an award of punitive damages;

f) Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

**g)** Grant all such other relief as the Court deems appropriate.

**JURY DEMAND**

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

Dated: March 10, 2026

*/s/ Katrina Carroll*
Katrina Carroll
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Office: 872-215-6205
Mobile: 847-848-1384
katrina@csclassactions.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff*
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
nar@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship*
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3290
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**Admitted Pro Hac Vice*